Minute Order Form (06/97)

JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 5060 | DATE | April 8, 2002 |
| CASE TITLE | Sullivan v. CBS Corporation, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Sullivan's Motion for Summary Judgment on the Trademark Dilution Count of his Complaint (doc. #46); Sullivan's Motion for Summary Judgment on Defendants' Counterclaims (doc. #47); Defendants' Motion for Summary Judgment or Alternatively Partial Summary Judgment (doc. #51)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to the Minute Order issued by the Court on March 29, 2002, for the attached reasons, the Court finds in favor of Defendants on all of Plaintiff's claims.
Enter Memorandum and Opinion.

(11) ■ [For further detail see order attached to this minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | APR 1 5 2002 | |
| | Notified counsel by telephone. | date docketed | 109 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| JHC | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANK M. SULLIVAN, III,<br>    Plaintiff,<br><br>v.<br><br>CBS CORPORATION, CBS<br>BROADCASTING, INC., SURVIVOR<br>PRODUCTIONS, LLC, TVT RECORDS,<br>LLC and TEE VEE TOONS, INC.,<br>    Defendants. | CASE NO. 00 C 5060<br><br>JUDGE WILLIAM J. HIBBLER |

**DOCKETED**
**APR 1 5 2002**

### MEMORANDUM OPINION AND ORDER

This case pits an old school 1980s rock band, Survivor, against the new school hit CBS reality-based television series, Survivor. Plaintiff Frank Sullivan ("Sullivan"), a member of "Survivor the Band," brought this action alleging trademark infringement, federal and common law trademark dilution, unfair competition and deceptive trade practices, against Defendants CBS Corporation, CBS Broadcasting, Survivor Productions, (collectively referred to herein as "CBS"), TVT Records and Tee Vee Toons, (collectively referred to herein as "TVT"), the producers and distributors of two music CDs and other merchandise bearing the logo of "Survivor the Series." Sullivan, who registered the mark "Survivor" in connection with the Band in 1994, maintains Defendants cannot also use the word "SURVIVOR" on their CDs and products for the Series. Pending before this Court are Sullivan's motion for summary judgment on the trademark dilution count of his Complaint (doc. #46), and motion for summary judgment on Defendants' counterclaims (doc. #47), and Defendants' motion for summary judgment on Sullivan's Complaint (doc. #51). For the following reasons, Plaintiff's motion for partial summary judgment is **DENIED**, Defendants' motion for summary judgment is **GRANTED**, and Plaintiff's motion for summary judgment is **DISMISSED** as moot[1].

---

[1] Because Defendants voluntarily dismissed their counterclaims, and this Court has determined that Defendants are entitled to summary judgment on all counts of the Complaint, Sullivan's motion for summary judgment on the counterclaims is dismissed as moot.

## BACKGROUND

### A. Survivor: The Band

In 1977, Sullivan and four other men formed the rock band Survivor. Between 1980 and 1988, Survivor released seven albums featuring hit songs such as "Eye of the Tiger" (theme song for Rocky III), "The Search is Over," "Moment of Truth" (title soundtrack for the movie Karate Kid), and "Burning Heart" (title soundtrack for Rocky IV). Throughout the mid-1980's, the Band toured extensively, and garnered several coveted music industry awards. In 1989, Survivor released its first greatest hits collections. Four years later, in 1993, Survivor followed up with a more complete greatest hits collection containing two new songs.

Notwithstanding the Band's success, several members decided to leave the group. Conflicts did not arise, however, until a former lead singer for the Band began performing with another rock band as Survivor. Not surprisingly litigation ensued, which led Sullivan and another member of the Band, James Peterik, in March 1994, to apply for a trademark registration for the name "Survivor." According to the application they submitted, Sullivan and Peterik sought to use the name in connection with "Entertainment services: namely providing band and/or musical services." The registration did not encompass merchandising by Sullivan or Survivor. Peterik eventually assigned his rights to Sullivan, thus leaving Sullivan as the lone holder of the mark.

Although Survivor has not released any new music in the United States since 1993,[2] the Band has continued to perform. Sullivan claims that between 1994 and 2000, he and other musicians performed at concerts under the name Survivor. How often they performed and before how many people is information Sullivan does not provide. Concerning the period from May 2000 to June 2001, though, Sullivan says the Band played venues in the United States and abroad seating anywhere from 7,000 to 40,000 people. At these concerts, the Band's CDs and other products bearing the name Survivor, including t-shirts and hats, were sold. Additionally, in 2000 and 2001, music by Survivor had been licensed to a television show and

---

[2]Sullivan avers that in 2001 "a greatest rock compilation album featuring solely music artist SURVIVOR was released in Germany titled 'Fire in Your Eyes.'" (Decl. of Charles DiGiovanni in Supp. of Sullivan's Resp. to Defs.' Rule 56.1 Statement of Material Facts, ¶12).

-2-

other companies for use in, among other things, television commercials.

Currently, the Band's music is still being played on the radio and sold in record stores and on the Internet. Customers seeking to purchase one of the Band's CDs would likely find it in the "rock group" or "rock compilation" section. Sullivan claims that the Band sells millions of dollars worth of records and related merchandise annually, and that he spends millions of dollars per year to advertise and promote products by the Band, but offers no documentary evidence in support of those contentions.[3]

### B. Survivor: The Television Series

In May 2000, over 20 years after Survivor the Band made its debut on the music scene, CBS began broadcasting a reality-based weekly television series called "Survivor." The premise of the Series is as follows. Sixteen castaway participants are "marooned" on an island; however, every three days, the castaways meet and vote by secret ballot to send one member of the group packing. This process of elimination continues until only two castaways remain. The seven most recently eliminated participants then decide which of the two finalists should be deemed the "survivor" and collect $1 million in prize money. Much to the surprise of everyone (perhaps not CBS), since its inception, the Series has been and continues to be one of the highest rated television programs, as millions of viewers faithfully tune in every week to observe the latest antics of the participants and see who will be the voted off next.

Prior to the premiere of Survivor the Series, CBS commissioned artists to create a specialized and unique logo for use in promotions and advertising. The logo designed in October 1999 for the first season consisted of an oval with the words "OUTWIT", "OUTPLAY", and "OUTLAST" around the outer perimeter, and the word "SURVIVOR" across the center, surrounded by an island scene with palm trees on top and water below. The logo designed in August 2000 for the second season varied slightly from the first because the 16 new participants were going to be "marooned" in Australia. Consequently, the oval containing the words "OUTWIT", "OUTPLAY", and "OUTLAST" around the outer perimeter remained, but the phrase across the center was changed to "SURVIVOR-AUSTRALIAN OUTBACK" with

---

[3]Sullivan does submit over 50 pages of documents which he labels as "representative royalty statements." (*See* Decl. of Annette McGarry in Supp. of Sullivan's Mot. for Summ. J. on Trademark Dilution, Ex. G). However, the numbers listed in those documents do not reflect annual sales of hundreds of thousands of dollars, let alone millions of dollars of the Band's products.

the logo superimposed on an Australian outback scene with a kangaroo and sunset.[4]

### C. Products Released in Connection with Survivor the Series

#### 1. Series CDs

##### a. Official Soundtrack

In February 2000, CBS commissioned two music composers to create original music scores for Survivor the Series. CBS subsequently entered into a licensing agreement with TVT for distribution of a Soundtrack CD consisting of a compilation of the original music from the Series. On the front jacket of the CD, the word "SURVIVOR" is written across the top in large block letters and nestled within trees on an island, while the words "THE OFFICIAL SOUNDTRACK TO THE HIT CBS TV SERIES" are written underneath in slightly smaller block letters, and located on top of blue water. The first season Series logo can be found on the lower right side of the CD next to a label which states, "The exotic world-beat rhythms from America's #1 show!" The Soundtrack is targeted to viewers of the Series, defined by CBS as primarily adults aged 18-49, and sold in the "soundtrack section" of retail music stores and on the Internet.

##### b. Compilation CD

In November 2000, TVT released a second CD in connection with the Series, containing songs with survival and/or island themes that were previously recorded by various artists, including "I Will Survive" by Gloria Gaynor, "Why Can't We Be Friends" by War, "Jungle Boogie" by Kool and the Gang, and "Another One Bites the Dust" by Queen. The back jacket of the compilation CD lists the names of the songs and artists featured. Survivor the Band is not one of them. The front jacket of the compilation CD depicts the series logo, although the oval has a large flame burning through it that obscures the words "OUTWIT" and "OUTPLAY". But underneath the logo are the words, "OFFICIAL PARTY SURVIVAL KIT" in block letters, along with "MUSIC INSPIRED BY THE HIT CBS TV SERIES" in slightly smaller

---

[4] In his response to CBS's statement of facts, Sullivan maintains that CBS used logos other than those created for the first and second season to advertise and promote the Series, and cites generally to the depositions of Holliday, Ross & Kryle in support of that statement. (*See* Sullivan's Resp. to Defs.' Statement of Material Facts, ¶¶ 21, 26). However, it is not the duty of this Court to scour deposition transcripts searching for evidence to substantiate an opposing party's claim that a material fact is disputed. Instead, it is the opposing party, Sullivan, who bears the responsibility of providing this Court with specific references to portions of the record that support his factual contention. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000).

block letters. As with the Official Soundtrack, CBS markets the compilation CD primarily to Series viewers, and sells it in music stores as well as on the Internet. The parties dispute exactly where the CD would be located in record stores though -- CBS says the "soundtrack" section only, while Sullivan contends it could also be found in the "rock/pop" or "rock compilation" section.

### 2. Series Merchandise

In June 2000, CBS developed and released a line of merchandise, including t-shirts, mugs, hats, calendars, bags, outdoor gear and a book, all bearing the Series logos.

### D. Survey Evidence

After Sullivan filed this trademark infringement and dilution action in August 2000, and was unsuccessful in persuading this Court to issue a temporary restraining order preventing Defendants from releasing the compilation CD, CBS commissioned a survey expert in September 2000 to determine whether there was any likelihood of confusion between the CDs featuring music from the Series and music of the Band. The surveyors showed 284 people in various locations throughout the United States the Official Soundtrack CD from the Series, and then asked them questions such as: (1) what the CD brought to mind; (2) who they thought put out the CD; and (3) whether they believed the CD was associated or affiliated with a particular music band, and if so, which one. Only 4.2% of those surveyed thought of Survivor the Band when they saw the CD; a mere 1.8% thought the Band put out the CD; and 4.9% believed the CD was affiliated with the Band. Based on those results, CBS' expert concluded that no likelihood of confusion existed between products of the Band and the Series.

Sullivan did not conduct his own survey. Instead, he retained an expert to review the findings of CBS' survey expert. Sullivan's expert concluded that the CBS survey contained fatal flaws in that, among other things, it did not address the relevant issues in the case and was not properly administered. Consequently, Sullivan contends the survey results are unreliable and therefore must be discounted.

### E. Summary Judgment Motions

In April 2001, Sullivan filed a motion for summary judgment on the trademark dilution claims in his Complaint. He contends that his "Survivor" mark is famous, but that Defendants have diluted its strength by their competing use of the mark on Series products. Defendants simultaneously filed a motion

for summary judgment on Sullivan's trademark claims of infringement and dilution, as well as his unfair competition and deceptive trade practices causes of action. They argue that the evidence does not establish either the likelihood of confusion or likelihood of dilution necessary to sustain any of those claims, and thus, as a matter of law, they prevail.

## STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of submitting affidavits or other evidentiary material to show the absence of a genuine material issue of fact and that judgment as a matter of law should be granted in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue of material fact exists only where the dispute over facts might affect the outcome of the lawsuit and there is sufficient evidence to support a jury verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met the initial burden, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial" in order to avert summary judgment. *Id.* at 250.

Even where cross-motions for summary judgment have been filed, the non-moving party must still show why summary judgment is not appropriate. *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598 (7th Cir. 1989). This Court will consider the merits of each cross-motion for summary judgment separately and draw all reasonable inferences and resolve all factual uncertainties against the party whose motion is under consideration. *American Broad. Co. v. Maljack Productions, Inc.*, 34 F. Supp. 2d 665 (N.D. Ill. 1998).

## ANALYSIS

In analyzing Sullivan's claims of trademark infringement, unfair competition, and deceptive trade practices, this Court considers one question -- whether Sullivan has established that Defendants' use of the mark "Survivor" is likely to cause confusion among consumers. *Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1351 (N.D. Ill. 1996). As for Sullivan's remaining claims of dilution, to succeed on those, he must prove a "likelihood of dilution," or, in other words, demonstrate that Defendants' use of the term

-6-

"Survivor" has deprived his mark of its distinctiveness and impact. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000).

## I.

### Extent of Trademark Protection

The threshold issue this Court must decide before proceeding to examine the trademark issues raised in this case is whether Sullivan's mark "Survivor" is entitled to protection. Although Sullivan's federal trademark registration for "Survivor" constitutes prima facie evidence as to the validity of the mark, *see* 15 U.S.C. § 1115(a), the actual level of trademark protection available "accords with the distinctiveness of the mark." *Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). Therefore, "generic terms receive no trademark protection; descriptive marks are protected only if the mark has achieved 'secondary meaning' within the relevant community; and suggestive, arbitrary, and fanciful marks are deemed inherently distinctive, and thus entitled to full protection." *Id.*

The term "Survivor" is not suggestive, arbitrary, or fanciful. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992) (describing marks deemed to be more than just generic or descriptive); *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 217 (7th Cir. 1978) (same). In fact, the word "survivor" is a commonly used noun that appears in a standard dictionary in lower case. As such, it could be deemed generic and thus unworthy of any trademark protection. *See, e.g., Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir. 1996); *Tsiolis.*, 946 F. Supp. at 1352. However, Sullivan has presented evidence showing that, at least within the music community, the term "survivor," although nondescript, is still associated with his Band. *Cf. Tsiolis*, 946 F. Supp. at 1352 ("aftermath" did not conjure up visions of plaintiff's heavy metal band). While "survivor" is not necessarily descriptive in the sense that it "specifically describes a characteristic or ingredient of a [rock band]," *Telemed*, 588 F.2d at 217, the Court cannot ignore the fact that such a general term has apparently acquired a "secondary meaning in the collective consciousness of the relevant community," *Mil-Mar*, 75 F.3d at 1157. Consequently, the Court finds that the term arguably fits better within the descriptive rather than generic category, and thus, in light of its secondary meaning, warrants trademark protection.

## II.

-7-

### Likelihood of Confusion (Counts I, II, V, VI, & VII)

Sullivan must demonstrate that Defendants have created a likelihood of confusion as to the origin of the CDs and merchandise related to the Series that are produced and distributed by them. *McGraw-Edison Co. v. Walt Disney Prod.*, 787 F.2d 1163, 1167 (7th Cir. 1986). In assessing the likelihood of confusion, the Seventh Circuit evaluates seven factors: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) defendant's intent to palm off its goods as those of the plaintiff. *Ty, Inc. v. Jones Group*, 237 F.3d 891, 896 (7th Cir. 2001). However, of the seven factors, three are considered more important -- similarity of marks, intent of the claimed infringer, and evidence of actual confusion. *Tsiolis*, 946 F. Supp. at 1353.

#### *1. Similarity of the Marks*

Sullivan insists that the marks are identical because the word "SURVIVOR" appearing in all capital letters is the prominent feature. However, "the proper method of comparison is conducted in light of what occurs in the marketplace, not in the courtroom." *S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 889 (N.D. Ill. 1998), *quoting Forum Corp. of North Am. v. Forum Ltd.*, 903 F.2d 434, 439 (7th Cir. 1990) (internal citations and quotation marks omitted). Indeed, "[t]he marks must be so similar that it is likely or probable, not just possible, that consumers, when presented with the marks singly, rather than side-by-side, would confuse [the allegedly infringing mark] with the source of [the trademark holder]. *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983). Viewing the marks as consumers would, the Court believes the differences are apparent.

Unlike Sullivan's mark, the Series logos consist of more than just the word "SURVIVOR." Indeed, the first season logo features the mark framed by the words "OUTWIT," "OUTPLAY" and "OUTLAST" within an oval, against a background island scene with palm trees on top and water below. The second season logo further distinguishes the mark by attaching to it the phrase "AUSTRALIAN OUTBACK" and superimposing an Australian outback scene with a kangaroo and sunset. The infamous oval with the words "OUTWIT," "OUTPLAY" AND "OUTLAST" remains. Sullivan is therefore correct that the marks are similar in that they contain the word "SURVIVOR," but the differences in appearance,

presentation and layout are such that consumers will undoubtedly distinguish between the two. *Tsiolis*, 946 F. Supp. at 1354. *See also Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1000 (N.D. Ill. 1997). Moreover, the jackets on both the Official Soundtrack CD and the Compilation CD specifically reference the hit CBS TV series, thereby signaling to consumers that those particular products are associated not with Survivor the Band, but with Survivor the Series. *See McGraw-Edison*, 787 F.2d at 1168; *Tsiolis*, 946 F. Supp. at 1354.

This factor, therefore, strongly favors Defendants.

### 2. *Similarity of Products*

"[A] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Ty, Inc.*, 237 F.3d at 900 (citation omitted). In a general sense, the Band and the Series offer similar products -- CDs and other merchandise bearing the mark "Survivor." However, as the Court noted above, both of Defendants' CDs prominently advertise an affiliation with the hit CBS TV series. And, all of the Series-related merchandise bears not just the word "Survivor," but the complete Series logo.

Sullivan nonetheless argues that consumers might believe the Band and Series CDs come from one source, since a CBS affiliate manufactured and distributed at least six of the Band's CDs in the 1980s, but that argument is unpersuasive. Any reference to CBS Records on the Band's CDs is found only on the bottom back of the jacket in fine print. Thus, it is highly unlikely consumers would even notice this statement, let alone infer a connection between CDs produced by CBS Records over 10 years ago, and those produced in connection with a CBS television show today.

Additionally, the Court finds it irrelevant that the Band's music has been featured on movie soundtracks. Because the Band does not claim to have ever released a soundtrack CD bearing the mark "Survivor," it is not similarly situated to Defendants who market the Series CDs as soundtracks to the television show. Furthermore, while Sullivan correctly states that the Compilation CD, like the Band's CDs, contains rock music from the 1980s, the featured songs, for the most part, all fit in with the theme of the show, i.e. outwitting, outlasting, and outplaying another contestant. This slight similarity in the type

of music, then, is outweighed by the clear indications that the CD relates to the CBS Series.

Accordingly, this factor favors Defendants.

### 3. Area and Manner of Concurrent Use

"The concurrent use factor focuses on the overlap of promotion, distribution, and sale of the parties' goods." *S Indus., Inc.*, 29 F. Supp. 2d at 891 (internal quotation and citation omitted). Defendants emphasize that the Series products are marketed to viewers of the television show only, a group consisting primarily of adults aged 18-49, but the Court finds it conceivable, given the varying age range of the target audience, that some of those same viewers might also be fans of the Band as well. Furthermore, it is undisputed that the Band and the Series CDs are sold within the same retail chains as well as on the Internet. Nevertheless, Defendants insist that there is no overlap between products here because the Series CDs, which are soundtracks, are not sold in the same section of retail music stores as the Band's CDs, which are rock music. *Compare Tsiolis*, 946 F. Supp. at 1355 (finding the product, marketing and consumers of a rap artist were different from that of a heavy metal band). Sullivan, on the other hand, maintains that is not necessarily true.

Unfortunately, neither Defendants nor Sullivan has submitted any reliable evidence to assist the Court in deciding this issue. An affidavit from a retail music store that explains how products are grouped and organized undoubtedly would have shed some light on this topic. Regardless, based on the meager evidence that has been offered to the Court, it is clear that in contrast to *Tsiolis*, *supra*, a case involving two distinctly different genres of music, an argument can be made here that record stores do not specifically distinguish between television soundtrack CDs and rock music CDs, particularly in a situation like this where a compilation CD released in connection with the television show also contains rock music.

As such, the Court finds this factor favors Sullivan.

### 4. Degree of Care

"The degree of care seeks to distinguish how likely the relevant group of consumers is to distinguish between different products." *Eli Lilly*, 29 F. Supp. 3d at 892. Sullivan contends that because CDs are relatively inexpensive items consumers are less deliberative in their purchases. However, this Court does not believe that is so. As the *Tsiolis* court explained, "customers are motivated to purchase

recordings based upon the performer" and "are 'necessarily discriminating' between musical genres." 946 F. Supp. at 1356. Consumers today are therefore much more likely to exercise a great deal of care in ensuring, before they spend their money, that they have selected not only a particular artist, but also a certain type of music that appeals to their individual tastes.

Accordingly, this factor strongly favors Defendants.

### 5. *Strength of Mark*

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli-Lilly*, 233 F.3d at 464 (internal quotation and citation omitted). *See also S Indus.*, 29 F. Supp. 2d at 892 ("'Strength' of a trademark measures the likelihood that a consumer will view a mark as source-identifying."). This Court has already determined that Sullivan's mark is entitled to some trademark protection because it is arguably descriptive. Nevertheless, "the strength or weakness of a trademark will define the scope of protection to be accorded the mark against confusing similarity of other marks. The weaker the mark, the less the likelihood of confusion, and therefore the more limited the protection available." *Tsiolis*, 946 F. Supp. at 1355 (internal quotation and citation omitted).

Sullivan points to his 25 years in the music business as evidence that the "Survivor" mark is strong, but that is insufficient to "answer the question of whether the name resonates in the consumers' consciousness." *Knaack Manuf. Co.*, 955 F. Supp. at 1002. Sullivan also claims to spend millions of dollars annually in advertising and promoting the Band, the result of which has been concert tours, a recent recording released in Germany, and the licensing of the Band's music. *See, e.g., Tsiolis*, 946 F. Supp. at 1344 ("strength is created by the extensive use and significant expenditure of a mark holder on advertising and promotion."). Unfortunately for Sullivan, though, he has offered no documentary evidence to back up his contentions about the monies or effort he has expended on the "use" of his mark.

But even if such proof were provided, it is not clear that as a result of Sullivan's claimed advertising efforts, the "Survivor" mark is currently a famous one. Sullivan has established that in 1994 the Band released its last album in the United States, which contained only two new songs, and that the Band began touring in May 2000 in the United States and abroad. The record is silent, however,

-11-

concerning the Band's activity during that six year gap. In addition, Sullivan could have offered more details regarding the Band's current activities, such as how many shows it has performed, whether it was the headliner or one of many groups playing, how many of the Band's albums are sold each year, and how much revenue Sullivan earns from participation in the Band, as such information would certainly buttress Sullivan's argument that the "Survivor" mark is a strong one. *See* Tsiolis, 946 F. Supp. at 1355. All the evidence produced by Sullivan thus far shows is that the Band still maintains some popularity. But if that popularity is narrow, "the scope of the trademark protection must be limited so as to be commensurate with the confined popularity." *Id.*

Moreover, Sullivan's hundreds of pages of newspaper articles mentioning the Band are insufficient to demonstrate that the "Survivor" mark is strong. Most of the stories are not about the Band itself, but instead are quick blurbs highlighting an upcoming performance of the Band or identifying the Band as the group who recorded a particular song. This Court does not dispute that the Band's music is still appreciated by consumers around the world. Who hasn't been pumped up, sitting in the stands at a high school or college sporting event, listening to the familiar strains of "Eye of the Tiger" greet the home team as they strut out of the locker room ready to rise up to the challenge of their rivals. Indeed, the recent licensing deals further attest to the viability of the Band's songs. But just because the songs produced by the Band in the 1980s remain popular today does not mean that the mark of the group associated with those songs is also strong. *See Knaack*, 955 F. Supp. at 1002 ("[i]t is the strength of its name which is the necessary predicate to establish confusion"). Sullivan has failed to come forward with any relevant evidence to show that the strength of his mark "Survivor" is anything other than weak. As such, this Court finds that any protection afforded to the mark must be narrowly restricted to the rock music field.

Because Defendants use the "Survivor" mark in conjunction with distinguishable logos, and clearly indicate that the CDs are affiliated with the television Series, they do not infringe upon the very narrow, limited protection this Court concludes Sullivan's mark is entitled to receive. Therefore, this factor strongly favors Defendants.

### 6. *Evidence of Actual Confusion*

Although Sullivan is required to demonstrate only a likelihood of confusion, the lack of evidence

showing actual confusion in the marketplace between the products of the Series and the Band is highly probative. *S Indus.*, 29 F. Supp. 2d at 893; *Tsiolis*, 946 F. Supp. at 1353. Defendants point to the survey commissioned by CBS in which a small percentage of individuals indicated they thought there might be a connection between the Official Soundtrack CD of the Series and the Band, as proof that no likelihood of confusion exists here. In response, Sullivan does not offer his own survey results, but rather proffers an expert who criticizes the CBS survey on a variety of grounds.

The survey methodology consisted of showing 284 individuals, an almost equal number of men and women in a variety of age ranges across the United States, the Official Soundtrack CD for the Series and essentially asking them what the CD brought to mind, who put it out, and whether they believed it was associated with a particular music band. Of those interviewed, 4.2% thought of the Band when they saw the CD, 1.8% (of the 29.2% who said they had an idea as to who put out the CD) believed the Band released it, and 4.9% (of the 7% who thought the CD might be affiliated with a musical group) chose the Band.

Sullivan's expert claims the CBS survey incorrectly focused on types of music, instead of the marks. However, this Court disagrees with that statement. Had the surveyors simply asked the interviewees questions about music from the Series and the Band, then the criticism might be valid, but that is not how the survey was conducted. Here, interviewees were shown the Official Soundtrack CD which bears the Series logo. Thus the survey participants, in fact, had before them the very mark contained on the Series CDs and related merchandise that Sullivan challenges in this lawsuit.

Next, Sullivan's expert claims the CBS survey is of limited applicability because only 52.1% of those surveyed expressed an interest in rock music. The mere fact that consumers prefer a certain type of music, though, does not necessarily suggest a lack of awareness about other genres of music. Indeed, the scope of the survey correctly extends beyond the narrow circle of rock music fans because the key question is whether *potential music purchasers* will be confused by the Series products. In any event, even if the surveyors restricted the focus of the survey as Sullivan suggests, that might not help the Band much, since its popularity peaked in the 1980s, and it has not released any new music in the United States since 1994. Thus it cannot be assumed that current rock music fans are even aware of the Band.

Sullivan's expert also challenges the fact that the survey addressed only the first Series CD, the Official Soundtrack, but not the second, the Compilation CD, and, in addition, does not mention other merchandise such as t-shirts, hats, bags, etc. First, the survey was conducted in September 2000, two months before Defendants even released the Compilation CD. Furthermore, although both CDs have different covers, the salient feature on each is the Series logo which contains similar elements, i.e, "SURVIVOR" in block letters across the center of an oval with the words "OUTWIT", "OUTLAST", and "OUTPLAY" around the perimeter. Even though a portion of the Series logo on the Compilation CD cover is obscured by a burning flame, enough of the logo remains visible so that either CD (and for that matter, a t-shirt or hat) could likely have been used interchangeably to test whether consumers would find the Series logo on these products confusing. Moreover, and most significantly, Sullivan had ample time to conduct his own survey to determine whether the logo on the Compilation CD or other merchandise was likely to cause confusion. The series merchandise was released in June 2000, while the Compilation CD was released months later in November 2000. Sullivan brought this lawsuit in August 2000, but neither party moved for summary judgment until April 2001. Sullivan therefore could have obtained his own survey evidence, but apparently chose not to do so. *See Henri's*, 717 F.2d at 357; *Tsiolis*, 946 F. Supp. at 1353.

Finally, Sullivan's expert attacks the administration of the survey, claiming the interviewers failed to follow critical directions, but Sullivan does not point to, nor does this Court find, any proof in the record demonstrating that errors occurred. Likewise, Sullivan's expert claims the survey questions were flawed, but makes no real effort to explain in what way. *Compare McGraw-Edison*, 787 F.2d at 1172; *Henri's*, 717 F.2d at 357-58. Thus, this Court finds no basis for rejecting the CBS survey results revealing that, at most, less than 5% of those surveyed thought there might be a connection between the Series CD and the Band, and consequently the likelihood of confusion is slight. *See, e.g., Henri's*, 717 .2d at 358-59 (7.6% confusion finding weighs against infringement).

Sullivan does contend that he has proof of actual confusion, but those arguments are weak. That an Internet search on Amazon.com for "Survivor" products, or a Soundscan report on "Survivor" sales, pulls up music from both the Series and the Band, says nothing. It is the possible confusion of *consumers* that

this Court is concerned with, not whether an inanimate object like a computer, wonderful though it may be, can in generating data expressly distinguish between music by Survivor the Series and Survivor the Band. Nor does this Court give much weight to the statement by one of the composers of music featured on the Official Soundtrack CD that Amazon.com users might mistakenly order a CD of the Band when they really intended to purchase a CD of the Series, as such errors could be attributed to carelessness, rather than confusion. As for post-sale confusion, Sullivan offers nothing more than speculation that this will occur. *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996) ("[T]he Lanham Act is concerned with consumer confusion when choosing to purchase, or not purchase, the items, not public confusion at viewing them from afar.") (internal quotation and citation omitted).

Consequently, the Court finds this factor strongly favors Defendants.

### 7. *Intent of Claimed Infringer*

Certainly there is no evidence of intentional copying of Sullivan's mark by Defendants. *See Rust Env't*, 131 F.3d at 1219 ("If a defendant willfully appropriates the mark of another, a court is more inclined to find likelihood of confusion."). True, CBS admits that it was aware of Sullivan's trademark registration before it created the Series, and that it has not yet filed a trademark application for the Series even though it vigorously challenges third parties who attempt to palm off aspects of the Series.[5] But it would be illogical to think that CBS chose to use the mark "Survivor" on products released in connection with the Series not because the television show itself turned out to be hugely successful, but in an attempt to capitalize on the success of a rock band that has not released any new music in the United States in almost a decade. *See Tsiolis*, 946 F. Supp. at 1354.

Therefore this factor strongly favors Defendants.

In sum, all but one of the relevant factors considered by this Court favors Defendants. Because Sullivan has not sustained his burden of identifying a genuine issue of material fact on the likelihood of confusion, Defendants are entitled to summary judgment on Sullivan's claims of trademark infringement, unfair competition and deceptive trade practices. *See, e.g., Spex, Inc.*, 847 F. Supp. at 579 ("Claims for

---

[5]The evidence pointed to by Sullivan concerning CBS's trademark enforcement activities does not demonstrate, as he suggests, that CBS asserted rights against others in the term "SURVIVOR." Rather, in each instance, CBS threatened legal action because the alleged infringer attempted to incorporate elements of the television show without the permission of CBS.

unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to principles set forth under the Lanham Act.").

## III.

### Likelihood of Dilution (Counts III & IV)

In considering Sullivan's remaining claims of trademark dilution, the Court focuses on whether Defendants' use of the term "Survivor" on the Series products is likely to cause a dilution of Sullivan's mark "Survivor." *See* 15 U.S.C. § 1125(c)(1). The purpose of antidilution statutes is to protect owners of famous marks "from the erosion of the distinctiveness and prestige of a trademark caused by the sale of other goods or services under the same name. . . ." *Illinois High School Ass'n v. GTE Vantage Inc.*, 99 F.3d 244, 247 (7th Cir. 1996). Thus, to prevail, Sullivan must establish four factors: (1) his "Survivor" mark is famous; (2) Defendants adopted their "Survivor" mark after his mark became famous; (3) Defendants' use of "Survivor" causes dilution of his mark; and (4) Defendants use the "Survivor" mark commercially and in commerce. *Eli Lilly*, 233 F.3d at 466.

Assuming for the sake of argument that Sullivan has established his mark is famous, the pertinent inquiry becomes whether Sullivan can demonstrate a likelihood of dilution.[6] Only two factors are relevant to this determination -- similarity of the marks, and renown of the famous mark, both of which the Court thoroughly addressed above in its likelihood of confusion analysis. Contrary to Sullivan's contentions, his mark and the Series logos are very much dissimilar when the differences in appearance, presentation and layout are considered. Furthermore, Sullivan has not sufficiently established that his "Survivor" mark is strong, such that Defendants' use of their "Survivor" logo to identify products related to the television Series would likely dilute the distinctiveness of Sullivan's "Survivor" mark on the Band's products. Unlike the plaintiff in *Eli Lilly*, Sullivan has not proven that his mark "has achieved extraordinary fame in American culture." 233 F.3d at 469. Rather, the renown of his mark, if any, is limited to the fairly narrow rock music scene, and thus no dilution is likely to occur. *See Knaack*, 955 F. Supp. at 1005-6.

Because no genuine issue of material fact exists on the likelihood of dilution, Defendants, not Sullivan, are entitled to summary judgment in their favor.

---

[6] Neither side disputes that elements 2 and 4 are satisfied.

-16-

## CONCLUSION

Summary judgment represents the moment of truth in a case, when the nonmoving party must come forward with all of his evidence if he wants to remain in the fight. Sullivan simply has not met his burden of demonstrating either his own entitlement to summary judgment, or a genuine issue of material fact that would warrant a trial. And so, while Survivor the Band may have the "Eye of the Tiger," it is Survivor the Series that has outwitted, outlasted, and outplayed its opponent. Summary judgment is granted in favor of Defendants.

**IT IS SO ORDERED.**

_____
WILLIAM J. HIBBLER, DISTRICT JUDGE

**DATED:** April 8, 2002